UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORWIN ALEJANDRO GARCIA BARRERA,<br><br>    Petitioner,<br><br>v.<br><br>TONYA ANDREWS, et. al,<br><br>    Respondents. | Case No. 1:25-cv-01006 JLT SAB<br><br>ORDER GRANTING PRELIMINARY INJUNCTION[1]<br><br>(Doc. 2) |

    Norwin Garcia Barrera[2], a Nicaraguan national, claims to have fled his home country after facing violent political persecution, including being beaten daily during a period of political imprisonment. (Doc. 1, ¶¶ 1, 7.) His father remains in prison in Nicaragua, his mother and one of his brothers are under house arrest, and another brother is in hiding, all because of their opposition to the current Nicaraguan government. (*Id*., ¶ 38.)

    Mr. Garcia entered the United States by "illegally crossing the international boundary without being inspected by an immigration officer at a designated Port of Entry." (Doc. 10-1 at 6) He was taken into custody on September 9, 2022 (Doc. 10-1 at 7) and detained for two days

---

[1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for Preliminary Injunction.

[2] Petitioner's papers refer to the Petitioner as "Mr. Garcia," so the Court does so too.

and then paroled into the United States on an "A-220A Order of Release."[3] (Doc. 1, ¶ 1.) In doing so, immigration officials necessarily determined that Petitioner did not present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."). Mr. Garcia has two children (aged 1 and 2 years) who are U.S. Citizens. (Doc. 1, ¶ 1.) He has appeared for all scheduled court dates and required check ins. (*Id*., ¶¶ 1, 40.) He has no criminal history in the United States. (*Id*., ¶ 41.)[4]

On July 23, 2025, Mr. Garcia appeared for his scheduled master calendar hearing, at which he submitted his asylum petition. (*Id*., ¶ 2.) At the hearing, DHS orally moved to dismiss his case; over Mr. Garcia's objections, the Immigration Judge (IJ) granted that motion and dismissed his removal proceedings, noting that Mr. Garcia filed his asylum application almost 3 years after his entry into the United States. (*Id*., ¶¶ 2, 45); *see also* 8 U.S.C. 1158 (a)(2)(B), (D) (requiring asylum petitions to be filed within one year after the date of arrival subject to exceptions for changed or extraordinary circumstances). On August 10, 2025, Mr. Garcia appealed the dismissal to the Board of Immigration Appeals ("BIA"). (*Id*.; *see also* Doc. 12-1 (filing receipt for appeal).) That appeal remains pending.

Upon exiting the courtroom after the July 23, 2025 hearing, Petitioner was arrested by ICE agents. (Doc. 1, ¶ 3.) He alleges:

> I left the immigration court building and as I was walking on the street, around six men, masked, armed, and in protective vests approached me. They pointed their weapons at me. I asked them what this was about, and they told me to "shut up" and listen to what they are going to say. They said that my case is closed, and I have no reason to be here and that I was going to be deported. I tried to tell them I have two young daughters, and I need to let my

---

[3] This is commonly referred to as "conditional release" or "release on own recognizance."

[4] Mr. Garcia was arrested once in December 2023, after a passerby called the police when he had a verbal argument with his partner, but no charges were filed. (Doc. 1, ¶ 41.) He claims to have informed ICE of the arrest and that charges were not brought; he further indicates that ICE was "satisfied" by that showing. (Doc. 1, ¶5.) Nonetheless, Respondent's opposition mentions only the arrest, not the absence of any charging document. (Doc. 10 at 2.)

> family know what is happening. They took my phone and shut it off. I was scared and told them it was ok to take me, just don't beat me up. This reminded me of what happened to me in Nicaragua where the police beat me up.

(Doc. 4-2, Declaration of Mr. Garcia, ¶ 5.) Thereafter he was transported to San Francisco to be processed for detention. (Doc 1, ¶ 4.) On July 24, 2025, he was transported to Golden State Annex, a detention facility in McFarland, California, where he remains. (*Id*.)

His detention has caused Mr. Garcia extreme distress "as he fears being harmed and being deported to Nicaragua, a place he is seeking asylum from." (*Id*., ¶ 7.) He continues to suffer pain in his shoulders from injuries sustained during his imprisonment in Nicaragua, and he suffers from eye pain, both of which are apparently being treated with pain medication at the detention facility. (Doc. 4-2, ¶ 8.) In addition, he is concerned about the wellbeing of his partner and daughters who have no independent means to support themselves. (*Id*.; *see also* Doc. 4-2, ¶ 11.) His family has very limited financial resources and cannot readily afford to communicate with Mr. Garcia while he is detained. (Doc. 4-3, ¶¶ 2, 4 (Declaration of Janury Mejia Vergara).)

On August 12, 2025, Mr. Garcia filed a petition for writ of habeas corpus alleging that his detention constitutes a violation of the Fifth Amendment's right to substantive and procedural due process. (Doc. 1, ¶¶ 54–63.) He seeks immediate release from custody; a declaration of the violation of his rights under the Fifth Amendments[5]; an injunction prohibiting his transfer away from this District and from his further unlawful detention; and for costs and attorney's fees. (*Id*. at 16.)

On the same day, he also filed an ex parte motion for a temporary restraining order. (Doc 2.) In this motion, he seeks immediate release "without bond or electronic monitoring[6]" where Respondents shall bear the burden of proof to show, by clear and convincing evidence, that Petitioner is a danger or a flight risk. (Doc. 4 at 2.)

The government opposes the issuance of preliminary injunctive relief and maintains that

---

[5] The jurisdictional allegations (Doc. 1, ¶ 10) and prayer (*id*. at 16) also mention the Administrative Procedure Act, but there is no APA claim alleged specifically.

[6] Petitioner seeks, as an alternative, "his immediate release and the setting of a pre-deprivation bond hearing before the Concord Immigration Court within 14 days." *Id*. The Court declines to consider this alternative relief.

Petitioner's detention is "mandatory" under expedited removal procedures set forth at 8 U.S.C. § 1225(b)(1), (*see generally* Doc. 10), notwithstanding the fact that Petitioner's removal proceedings pursuant to 8 U.S.C. § 1229a are on appeal to the BIA. Moreover, the parties agree that Mr. Garcia was not placed in expedited removal upon his arrival (or at any other time). At most, the government suggests that ICE sought the dismissal of the § 240 proceedings to put him in expedited removal, but there is no evidence this has occurred.

For the reasons set forth below, the Court converts the request for a temporary restraining order into a request for a preliminary injunction and **GRANTS** the motion.

## II.  LEGAL BACKGROUND

### A.  Section 240 v. Expedited Removal Proceedings

Immigration law provides two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. The first, commonly referred to as "Section 240" or "Section 1229a" proceedings, is the standard mechanism for removing inadmissible noncitizens. *See generally* 8 U.S.C. § 1299a. "Section 240 removal proceedings take place before an [Immigration Judge (IJ)], an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them." *Coalition For Humane Immigrant Rights, v. Noem*, No. 25-CV-872 (JMC), , at *3 (D.D.C. Aug. 1, 2025)[7] (citing 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses.").)

> [Section 240 proceedings] are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are recorded, and a transcript is made available if a party appeals the decision. *Id*. § 1229a(b)(4)(C). A section 240 proceeding typically takes place over the course of multiple hearings due to the built-in procedures. This allows time for noncitizens to both gather evidence in support of petitions for relief available in immigration court (like asylum and certain adjustments of status) and seek collateral relief from other components of DHS (like adjustment of status on the basis of marriage or family). Upon a decision by the IJ, either party may appeal to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen may then appeal that

---

[7] This ruling has been appealed to the D.C. Circuit, *Coalition for Humane Immigrant Rights, et al v. Kristi Noem*, et al, 25-5289 (D.C. Cir.), though it appears that the stay ordered by *Coalition* remains in place.

decision to a U.S. court of appeals. 8 U.S.C. § 1252.

*Coalition*, 2025 WL 2192986, at *3 (internal record citations omitted).

Alternatively, an immigrant may be placed in "expedited removal" status for reasons, including that the person entered the United States without a valid visa or other valid entry documents. *See generally* 8 U.S.C. § 1225. In expedited removal, the process is overseen by an immigration officer, rather than an IJ. 8 C.F.R. § 235.3(b)(2)(i). The officer asks the immigrant questions about their "identity, alienage, and inadmissibility," and whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no recording or transcript is made. 8 C.F.R. § 235.3(b)(2)(i).

Under the expedited removal process, if the immigrant claims asylum of fear of persecution or torture, or a fear of returning to his or her country, "the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30." § 253(b)(4). Once the referral happens, the referring officer must provide the immigrant with a written disclosure (Form M-444), which describes the credible fear interview, including,

>  (A) The purpose of the referral and description of the credible fear interview process;
>  (B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;
>  (C) The right to request a review by an immigration judge of the asylum officer'' credible fear determination; and
>  (D) The consequences of failure to establish a credible fear of persecution or torture.

§ 253(b)(4)(i). The asylum officer then must interview the immigrant and determine if the immigrant expressed a credible fear of persecution or torture. Whatever the officer's determination, it must be reviewed by the supervisory asylum officer before it becomes effective. § 208.30(3)(8). If there is a finding of credible fear, the case is converted to a § 240 proceeding[8] and set before an IJ. If the asylum officer and the supervisor determine that the immigrant has not demonstrated a credible fear of persecution or torture, the immigrant may request review by an IJ.

---

[8] Alternatively, the case may be moved into administrative asylum proceedings under § 208.30(f).

§ 208.30(g). Essentially, the IJ's determination is final. *Id*. Likewise, habeas corpus review of the determinations made related to the expedited removal is limited. 8 U.S.C. § 1252(e)(2).

In *Coalition*, the District of Columbia District Court determined that under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), a person who has been paroled without first having been placed in expedited removal <u>cannot be designated for expedited removal</u>. As *Coalition* explained:

> Noncitizens may be eligible for expedited, rather than section 240, removal only if they are inadmissible on the basis that they either lack proper entry documents or falsified or misrepresented their application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id*. § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Among that set, only two categories of noncitizens are eligible for expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve] not been admitted or paroled into the United States" and cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii).6 The statute permits the Attorney General (who has since delegated this authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. And that designation lies within the Secretary's "sole and unreviewable discretion." *Id*. § 1225(b)(1)(A)(iii); *see* 8 C.F.R. § 235.3(b)(ii) . . .

*Coalition* concluded that the statute "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.[9] Indeed, though the government asserts that under 8 C.F.R. § 235.3(b)(1)(ii), "Expedited Remocal provisions can be applied at any time," this is contrary to the express language of the section. This section reads,

> (1) The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:
>
> (i) Arriving aliens, as defined in 8 CFR 1.2;[10]

---

[9] Coalition also stayed several administrative actions undertaken by DHS, including one memorandum issued in January 2023 that directed relevant officials to "consider" placing in expedited removal "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," a process that "may include steps to terminate any ongoing removal proceeding and/or active parole status," as well as a separate February 2025 directive that ICE "consider" for expedited removal "paroled arriving aliens." *Coalition*, 2025 WL 2192986, *9–10, 39. The government does not address *Coalition* or its consequences in its briefing here.

[10] "Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry . . . An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." Section 212(d)(5) is set forth at 8 U.S.C. § 1182, which, as noted above, vests discretion in ICE officials to place immigrants on parole for humanitarian reasons or due to it providing a significant public benefit.

6

> (ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States **without having been admitted or paroled** following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2–year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section.

8 C.F.R. § 235.3(b)(1)(ii) (Emphasis added). This section specifically precludes expedited removal as to any alien placed on parole.

### B. Parole

ICE may choose to release a person on parole. The decision is discretionary and is made on a case-by-case basis. An immigrant who has been detained at the border, may be paroled for humanitarian reasons or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A)) or he may be conditionally released (8 U.S.C. § 1226(a)). These are distinct procedures. A person on conditional parole is usually released on their own recognizance subject to certain conditions such as reporting requirements.[11] To be released on conditional parole/ own recognizance, there must be a finding that the immigrant does not pose a risk of flight or danger to the community. *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007). One important difference between these types of parole is that conditional release does not provide a pathway for the immigrant to seek adjustment of status under 8 U.S.C. § 1255(a). *Id*. at 1119-1120.

### C. Parole/OR Revocation

In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025)—issued several weeks before Mr. Garcia's arrest on July 23, 2025—the court explained the parole process in immigration cases and noted that before parole may be revoked, the parolee must be given written notice of the impending revocation, which must include a cogent description of the reasons therefore. The court held:

> Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required

---

[11] An immigrant cannot be released on conditional parole if they are subject to mandatory detention under § 1226(c). There is no suggestion that § 1226(c) applies in this case.

> detention, to be "paroled" into the United States. This provision, at issue in this case, states:
>
>> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**
>
> 8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. Parole revocations in the context of the INA, must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting § 212.5(e)). Section 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

In considering *Y-Z-H-L* and § 212.5(e), other courts have found that the statute requires a case-by-case analysis as to the decision to revoke parole. In *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), the Court held similarly, though in the context of humanitarian parole:

> This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the

> reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." See 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the Court reached a similar conclusion relying on the Due Process Clause. In *Pinchi,* the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. See *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.,* emphasis added. Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

///

///

///

## II. ANALYSIS

### A. Jurisdiction

#### 1. Habeas Corpus

Under 28 U.S.C. § 2241, the Court the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Mr. Garcia seeks his immediate release from custody, which he contends violates the Constitution of the United States. (*See* Doc. 1 at 16.) Thus, he properly invokes the Court's habeas jurisdiction.

#### 2. Judicial Review under the INA

The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there is no removal order at issue here. Thus, Court has the authority to review the termination of Mr. Garcia's parole. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

### B. Preliminary Injunction

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

The status quo refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the Court's view, that is the status before Mr. Garcia was arrested and was still on parole. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

Even if the Court's action here constitutes a mandatory injunction,[12] the evidence supports that action. Mr. Garcia alleges he has suffered and is suffering violations of his substantive and procedural due process rights and that his continued unlawful detention will impose on him serious injury if the injunction does not issue. The injunction issued here is on firm legal footing;

---

[12] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

due process clearly requires that Petitioner be given a hearing before his bond is revoked. These injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief is appropriate even under the higher standard for mandatory injunctions.[13]

### 1. Likelihood of Success on the Merits

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). When an immigrant is placed into parole status after having been detained, a protected liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[14]. The Due Process Clause may protect this liberty interest even where a statute allows the immigrant's arrest and detention and does not provide for procedural protections. *Id.* (Due Process requires pre-deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

*Morrissey* observed that parole allows the parolee to enjoy the same activities as those who have not been arrested and held in custody including, living at home, having a job, and "be[ing] with family and friends and to form the other enduring attachments of normal life."

---

[13] The government questions whether the Court can order preliminary relief of the nature requested here because the relief sought is akin to the relief requested in the underlying § 2241 petition. (Doc. 10 at 4.) The government cites *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which indeed held that entering "judgment on the merits in the guise of preliminary relief is a highly inappropriate result." But the circumstances of that case were quite different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought to keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all practical purposes." *Id*. Some district courts have relied on this line of cases to deny immigration detainee's requests for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL 2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v. Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28, 2024) (citing *Mendez*, *Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*). *Doe v. Bostock*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024), cited by the government (Doc. 10 at 4), is not persuasive. There, the petitioner was released from a federal correctional facility after serving a criminal sentence directly into ICE custody and then challenged her <u>continued</u> detention. *Doe v. Bostock*, No. C24-0326-JLR-SKV, 2024 WL 3291033, at *2 (W.D. Wash. Mar. 29, 2024) (report and recommendation). Under those circumstances, the status quo was <u>detention</u> not release, so the requested form of preliminary relief –immediate release—was inappropriate for that reason.

[14] In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*, 604 U.S. ___, 145 S. Ct. 1003, 1006 (2025).

*Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in his "continued liberty." *Id.* at 481–84. As noted above, *Pinchi,* 2025 WL 2084921, at *3 agreed. The government appears to attempt to skirt this line of cases by arguing that DHS may "at any time" move Mr. Garcia from Section 240 proceedings to expedited removal. (Doc. 10 at 4.) The government argues:

> Once a petitioner is in expedited removal proceedings, that individual is subject to mandatory detention. 8 U.S.C. § 1225 (b)(1)(A)(i)The Petitioner's parole was at the discretion of ICE Enforcement and Removal Operations (ERO). DHS retains discretion to redetermine or revoke bond at any time following release. 8 C.F.R. §§ 236.1(c)(9) ("When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained. If detained, unless a breach has occurred, any outstanding bond shall be revoked and canceled.").

(Doc. 10 at 4.) *Coalition* raises serious doubts as to the applicability of such arguments to Mr. Garcia's factual situation, given that it "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.

Though DHS could have placed Mr. Garcia in expedited removal proceedings when he arrived in the country, it did not do so. Rather, ICE placed him into § 240 proceedings and conditionally paroled him for well over two years. The Court acknowledges that the statute indicates that, "The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. §

1226(b).[15] As noted above, this does not mean that DHS may exercise its discretion in a manner that is inconsistent with constitutional requirements.

Respondent suggests that notwithstanding any of the above the dismissal of Mr. Garcia's Section 240 proceeding is dispositive here. (Doc. 10 at 2.) But the reply demonstrates that Mr. Garcia has appealed that dismissal. (*See* Doc. 12-1 (BIA receipt of notice of appeal).) According to Mr. Garcia, the pending appeal necessarily means that his 240 proceedings are still ongoing and thus that he cannot be summarily put into expedited removal. (*See* Doc. 12 at 4); *see also Mata Velasquez,* 2025 WL 1953796, at *9 (explaining that Petitioner's "right to have his appeal heard by the BIA prohibits the initiation of expedited removal proceedings—and therefore mandatory detention under 8 U.S.C. § 1225(b)(1)—before his section 240 proceedings have been allowed to run their procedural course.").

Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been applied to Mr. Garcia are sufficient to protect the liberty interest at issue. *Pinchi* at *3. In *Mathews*, the Court determined,

---

[15] Even assuming, arguendo, that Mr. Garcia's original "parole" was processed for "humanitarian reasons" or "significant public benefit" under the exceptions to mandatory expedited removal detention, *see* 8 U.S.C. § 1182(d)(5)(A), *Coalition* suggests that a court reviewing revocation of that kind of arrest should not ignore that the parole occurred:

> [S]ection 1182(d)(5)(A) does not, as Defendants insist, say that parolees return, upon the termination or expiration of their parole, to "the position of an applicant for admission standing at the threshold of entry." [ ]. Rather, the provision says that two things happen to such a parolee: (1) he "shall forthwith return or be returned to the custody from which he was paroled"; and (2) "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." In other words, the noncitizen is physically brought back into immigration detention ("custody") and then legally continues to be treated as an "applicant for admission," because his parole itself did not constitute an admission. *See* 8 U.S.C. § 1182(d)(5)(A) (stating that parole "shall not be regarded as an admission of the alien"). **That does not prove that the law treats the parole as if it never happened.** At minimum, it recognizes that the parole physically happened, because it contemplates that the noncitizen must be returned to detention. Moreover, it does not imply a return to the status of an applicant for admission, because a noncitizen is already an "applicant[ ] for admission" while their parole is active. *See, e.g., Biden v. Texas*, 597 U.S. 785, 806 [(2022)] ("[T]he INA expressly authorizes DHS to process applicants for admission under a third option: parole.") (citing 8 U.S.C. § 1182(d)(5)(A)). Accordingly, the statute says that the noncitizen whose parole is terminated "continue[s]" to be treated as an applicant for admission, not that she "returns" to the status of applicant for admission.

2025 WL 2192986, at *24 (emphasis added) (internal record citations omitted).

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

During his almost three years on parole, Mr. Garcia obtained work and built a family in the United States, including becoming the father of two U.S. Citizens. (Doc. 1, ¶ 1) Thus, parole allowed him to build a life outside detention, albeit under the terms of that parole. Mr. Garcia has a substantial private interest in being out of custody, which would allow him to continue in these life activities, including supporting his family. As other courts have done, the Court concludes that the government's interest in detaining Mr. Garcia or re-detaining him without a hearing, is slight. There is no dispute he has abided by all conditions of his parole and, works and has no criminal record. Other than the non-final (because of appeal) dismissal <u>at the government's request</u> of his Section 240 proceedings, there has been no change in Mr. Garcia's circumstances that would warrant a finding that he is either a flight risk or a danger to the community. Thus, the Court concludes that he has demonstrated a likelihood of success on the merits on his procedural due process claim.

2.  <u>Irreparable Harm</u>

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) [the inability to pursue a petition for review may constitute irreparable harm]. The evidence demonstrates that Mr. Garcia is suffering significant emotional distress from his custodial status and that his family's circumstances are made even more difficult due to his absence.

///

3. <u>Balance of the Harms/Public Interest</u>

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
>
> This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, there appears to be no dispute that there is no evidence that risk that Mr. Garcia poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Mr. Garcia.

4. <u>Bond</u>

"The court may issue a preliminary injunction or a temporary restraining order only if the

movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

### C.    Parole Revocation hearing

Mr. Garcia requests an order enjoining his re-detention without a pre-deprivation hearing where the government bears the burden of proof. (*See* Doc. 4-1 at 19.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the burden to establish by clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

*Id.* at 1212.

However, as the *Pinchi* court explained, *Rodriguez Diaz* did not address the question presented here:

> The Ninth Circuit did not hold in *Rodriguez Diaz* that noncitizens facing removal under section 1226(a) have no due process right to a pre-detention hearing. It held only that a noncitizen detained under section 1226(a) does not have a right to a second bond hearing when the only changed material condition since their first bond hearing is the duration of their detention. Because the question presented here was not presented in Rodriguez Diaz, the court had no opportunity to address it.

*Pinchi*, 2025 WL 2084921, at *4. *Pinchi* went on to discuss why the calculus changes for an individual who had been paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who have never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). "Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4

    This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id.* at *7. Doing so is logical under the circumstances for the reasons articulated in *Pinchi* – namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that

18

the government should be required to bear the burden of providing a justification for the re-detention.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS:**

1. Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED**.

2. Mr. Garcia **SHALL** be released immediately from Respondents' custody. DHS **SHALL NOT** impose any additional restrictions on her, such as electronic monitoring, unless that is determined to be necessary at a future pre-deprivation/custody hearing.

3. Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from re-arresting or re-detaining Mr. Garcia absent compliance with constitutional protections, which include at a minimum, pre-deprivation notice—describing the change of circumstances necessitating his arrest—and detention, and a timely hearing. At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Mr. Garcia poses a danger to the community or a risk of flight, and Mr. Garcia **SHALL** be allowed to have counsel present.

4. The petitioner may file a brief on the merits within 60 days. The government may file an additional brief related to the merits of the petition within 60 days thereafter and the petitioner may file a reply brief within 15 days of the government's brief.

IT IS SO ORDERED.

Dated:   **August 21, 2025**

*/s/ Jennifer L. Thurston*
UNITED STATES DISTRICT JUDGE